

1  John P. Kristensen (SBN 224132)
2  **KRISTENSEN LAW GROUP**
3  120 Santa Barbara St., Suite C9
   Santa Barbara, California 93101
4  Telephone: (805) 837-2000
   *john@kristensen.law*
5
6  Leigh S. Montgomery*
   Texas Bar No. 24052214
7  **EKSM, LLP**
8  4200 Montrose Blvd., Suite 200
   Houston, Texas 77006
9  Phone: (888) 350-3931
   *lmontgomery@eksm.com*
10 service only: *service@eksm.com*
11
12 **ATTORNEYS FOR PLAINTIFF AND**
   **THE PUTATIVE CLASS**
13 (* denotes *pro hac vice* forthcoming)
14
15           **UNITED STATES DISTRICT COURT**
16        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
                  **WESTERN DIVISION**
17
   BILLY JOEL VILLAREAL,             ) Case No. 2:25-cv-4105
18 individually and on behalf of all  )
   others similarly situated,         ) **CLASS ACTION**
19                                    )
20                       Plaintiff,   ) **COMPLAINT FOR DAMAGES**
                                      )
21          vs.                       )
                                      ) **1. Negligence and Negligence *Per Se*;**
22 SILGAN CONTAINERS, LLC,            ) **2. Breach of Implied Contract;**
                                      ) **3. Invasion of Privacy;**
23                     Defendant.     ) **4. Unjust Enrichment; and**
24                                    ) **5. California Unfair Competition Law.**
                                      )
25                                    )
                                      )
26                                    )
                                      )
27                                    )
                                      ) **DEMAND FOR JURY TRIAL**
28 _____   )

---

**PLAINTIFF'S CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**
**– 1 –**

Plaintiff Billy Joel Villareal, ("Plaintiff") brings this Class Action Complaint against Silgan Containers, LLC, ("Silgan" or "Defendant"), on behalf of himself individually and on behalf of all others similarly situated ("Class Members"), and alleges, upon personal knowledge as to his own actions and his counsel's investigations, and upon information and belief as to all other matters:

## I.    INTRODUCTION

1.    This class action arises out of the recent data security incident and data breach that was perpetrated against Defendant (the "Data Breach"), which held in its possession certain personally identifiable information ("PII" or "Private Information") of Plaintiff and other current and former employees of Defendant, the putative class members ("Class"). Defendant's public notice of the Data Breach states that they discovered suspicious activity on its systems in February 2024.[1]

2.    On April 25, 2025, Defendant mailed Plaintiff a letter advising him that the Private Information compromised in the Data Breach included certain personal information of his. This Private Information included but is not limited to "name and Social Security Number and date of birth." Notice of Data Breach, Exhibit A hereto.

3.    The Private Information was acquired by cyber-criminals who perpetrated the attack and remains in the hands of those cyber-criminals.

4.    The Data Breach resulted from Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Private Information with which they were entrusted for employment.

5.    Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private

---

[1] Defendant Silgan, "Submitted Breach Notification Sample," *available at* https://oag.ca.gov/system/files/Silgan%20Containers%20-Sample%20Notice.pdf (*last accessed* May 6, 2025).

Information that they collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information was subjected to unauthorized access by an unknown third party and precisely what specific type of information was accessed.

6. Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

7. Defendant, through its employees, disregarded the rights of Plaintiff and Class Members (defined below) by, among other things, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions. Defendant also failed to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class Members' Private Information and failed to take standard and reasonably available steps to prevent the Data Breach.

8. In addition, Defendant's employees failed to properly monitor the computer network and systems that housed the Private Information. Had Defendant's employees (presumably in the IT department) properly monitored its property, it would have discovered the intrusion sooner.

9. Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

10. Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes. These crimes include opening new financial

accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

11.     Because of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

12.     Plaintiff and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

13.     Through this Complaint, Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose Private Information was accessed during the Data Breach.

14.     Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

15.     Accordingly, Plaintiff sues Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence and negligence *per se*, (ii) breach of implied contract, (iii) invasion of privacy, (iv) unjust enrichment; and (v) violations of the California Unfair Competition Law.

## II.     **PARTIES**

16.     Plaintiff Billy Joel Villareal, is and at all times mentioned herein was an individual citizen of Washington, residing in the city of Toppenish.

17.     Plaintiff provided Defendant with his sensitive Personal Information as a necessary part of his employment with Defendant. Defendant sent Plaintiff a

1  notice informing him that his sensitive information was part of Defendant's Data

2  Breach.

3      18.    Plaintiff reasonably expected and understood that Defendant would

4  take, at a minimum, industry standard precautions to protect, maintain, and

5  safeguard his Private Information from unauthorized users or disclosure, and would

6  timely notify him of any data security incidents related to the same. Plaintiff would

7  not have provided his Private Information to Defendant had he known that

8  Defendant would not take reasonable steps to safeguard it.

9      19.    Defendant Silgan Containers, LLC, is a Delaware limited liability

10  company with its principal place of business located at 21600 Oxnard Street, Suite

11  1600, Woodland Hills, California 91367.

12              **III.    JURISDICTION AND VENUE**

13      20.    This Court has subject matter jurisdiction over this action under the

14  Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy

15  exceeds $5 million, exclusive of interest and costs. There are more than 100

16  putative class members and minimal diversity exists because Plaintiff and many

17  putative class members are citizens of a different state than Defendant. Thus,

18  minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

19      21.    This Court has personal jurisdiction over Defendant because Silgan

20  operates, and is headquartered, in this District and conducts substantial business in

21  this District.

22      22.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(l)

23  because a substantial part of the events giving rise to this action occurred in this

24  District. Defendant is also based in this District, maintains Plaintiff's and Class

25  Members' Private Information in this District, and has caused harm to Plaintiffs

26  and Class Members from and/or in this District.

27  ///

28  ///

## IV.    FACTUAL ALLEGATIONS

### *Defendant's Business*

23.    Defendant is a packaging and container manufacturer based in California. Founded in 1987, Silgan specializes in metal food packaging solutions and is one of the largest providers of steel food cans and aluminum food cans and trays in the United States.[2]

24.    Plaintiff and Class Members are current and former employees of Defendant.

25.    In the ordinary course of employment with Defendant, each employee must provide (and Plaintiff did provide) Defendant with sensitive, personal, and private information, such as his or her:

- address;
- telephone number;
- date of birth;
- Social Security number;

26.    Upon information and belief, in the course of collecting Private Information from employees, including Plaintiff, Defendant promised to provide confidentiality and adequate security for the data it collected from them through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

27.    Plaintiff and the Class Members, as employees of Defendant, relied on these promises and on this sophisticated business entity to keep their sensitive Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Employees, in general, demand security to safeguard their Private Information, especially when their Social Security numbers and other sensitive Private Information is involved.

---

[2] https://silgancontainers.com

### *The Data Breach*

28.     A Data Breach occurs when cyber criminals intend to access and steal Private Information that has not been adequately secured by a business entity like Defendant.

29.     The Notice of Data Breach Defendant mailed to Plaintiff describes the Data Breach as follows:

> **What Happened?** On February 15, 2024, Silgan became aware of suspicious activity related to certain computer systems. We promptly took steps to secure our environment and launched an investigation to determine the nature and scope of the activity. The investigation determined there was unauthorized access to certain files and folders within Silgan systems and some information was copied from these systems between February 2, 2024 and February 16, 2024.

> **What Information Was Involved?** Silgan undertook a comprehensive review in order to determine whether the involved files contain any sensitive information and to enrich the data to identify impacted individuals. This review was completed on or about December 6, 2024 and determined that information present on the systems included your name and Social Security number and date of birth. To date, Silgan is unaware of any actual or attempted identity theft or fraud as a result of this event and is providing you with this notice out of an abundance of caution.

30.     Defendant's notice letter to Plaintiff was dated April 25, 2025—over 14 months after the data breach occurred.

31.     Defendant had obligations created by contract, industry standards, common law, and representations made to Class Members, to keep Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

32.    Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

33.    Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep Plaintiff's and Class Members' PII safe and confidential.

34.    Defendant had obligations created by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTCA"), industry standards, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

35.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

36.    Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting institutions that collect and store PII, like Defendant, preceding the date of the Data Breach.

37.    In 2023, a record 3,205 data breaches occurred, resulting in around 353,027,892 individuals' information being compromised, a 78% increase from 2022.[3] Of the 2023 recorded data breaches, 259 of them, or 8%, were in the manufacturing industry.[4] The 259 reported breaches reported in 2023 exposed

---

[3] *See* Identity Theft Resource Center, *2023 Data Breach Report* (January 2024), *available at* https://www.idtheftcenter.org/publication/2023-data-breach-report/ (last visited May 6, 2025).
[4] *Id.*

nearly 5 million sensitive records. In 2022, there were 249 reported breaches that exposed just over 24 million sensitive records in 2022.[5]

38.     Data breaches such as the one experienced by Defendant have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.

39.     Data thieves regularly target institutions like Defendant due to the highly sensitive information in its custody. Defendant knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

40.     The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[6]

41.     Unfortunately, Defendant failed to take adequate measures to protect Plaintiff's and Class Members' PII stored on its computer servers, including failing to implement reasonable cybersecurity safeguards or policies to protect PII, and failing to supervise its information technology or data security agents and employees, or vendors, to prevent, detect, and stop breaches of its systems.

42.     As a direct result of Defendant's failures, in February 2024, cybercriminals infiltrated Defendant's systems, gained access to, and copied, the PII of Plaintiff and Class Members, including but not limited to their names, and Social Security Numbers ("the Data Breach").

43.     As a result of the Data Breach, its victims face a lifetime risk of identity theft, as it includes sensitive information that cannot be changed, like their

---

[5] *Id*. at 11, Fig.3.
[6] IBM, *Cost of a Data Breach 2022: A Million-Dollar Race to Detect and Respond*," https://www.ibm.com/reports/data-breach (last acc. Apr. 14, 2023).

Social Security numbers. Accordingly, the credit monitoring and identity theft protection which Defendant offered in the Notice of Data Breach are wholly insufficient to compensate Plaintiff and the Class Members for their damages resulting from the Data Breach.

44.    Defendant's offer to supply Plaintiff and the Class Members with credit monitoring services supports the reasonable belief that, Plaintiff's and the Class Members' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

### *Data Breaches Are Preventable*

45.    Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

46.    Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

47.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[7]

48.    To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enable strong spam filters to prevent phishing emails from reaching the

---

[7]    How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.
- Execute operating system environments or specific programs in a virtualized environment.
- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[8]

49.    To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure Internet-Facing Assets**

-    Apply latest security updates

-    Use threat and vulnerability management

-    Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

-    Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

-    Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

-    Use [multifactor authentication] or [network level authentication] and use strong,

     randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

-    Monitor for adversarial activities

---

[8] *Id.* at 3-4.

1  -       Hunt for brute force attempts

2  -       Monitor for cleanup of Event Logs

3  -       Analyze logon events;

4  **Harden infrastructure**

5  -       Use Windows Defender Firewall

6  -       Enable tamper protection

7  -       Enable cloud-delivered protection

8  -       Turn on attack surface reduction rules and [Antimalware Scan

9  Interface] for

10       Office[Visual Basic for Applications].[9]

11       50.    Given that Defendant was storing the Private Information of its current

12  and former employees Defendant could and should have implemented all of the

13  above measures to prevent and detect cyberattacks.

14       51.    The occurrence of the Data Breach indicates that Defendant failed to

15  adequately implement one or more of the above measures to prevent cyberattacks,

16  resulting in the Data Breach and data thieves acquiring and accessing the Private

17  Information of, upon information and belief, thousands to tens of thousands of

18  individuals, including that of Plaintiff and Class Members.

19       ***Plaintiff's Experience***

20       52.    Plaintiff Billy Joel Villareal is and at all times mentioned herein was

21  an individual citizen of Washington, residing in the city of Toppenish.

22       53.    Plaintiff provided Defendant with his sensitive Private Information as

23  a condition of employment with Defendant. Plaintiff received Notice of the Data

24  Breach around April 25, 2025, informing him that his sensitive information was

25  part of Defendant's Data Breach, including his "name and Social Security number

26

27  _____

[9] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:*
28  https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

and date of birth."

54.     Plaintiff reasonably expected and understood that Defendant would take, at a minimum, industry standard precautions to protect, maintain, and safeguard his Private Information from unauthorized users or disclosure, and would timely notify hi, of any data security incidents related to the same. Plaintiff would not have provided his Private Information to Defendant had he known that Defendant would not take reasonable steps to safeguard it.

55.     Plaintiff is very careful about sharing his sensitive PII. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff also stores any documents containing his sensitive information in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

56.     Because of the Data Breach and at the recommendation of Defendant and its Notice, Plaintiff made reasonable efforts to mitigate the effect of the Data Breach, including, but not limited to, researching the Data Breach, reviewing financial statements, and monitoring his credit information.

57.     Plaintiff has spent much time responding to the dangers from the Data Breach and will continue to spend valuable time he otherwise would have spent on other activities, including, but not limited to work and recreation.

58.     Because of the Data Breach, Plaintiff anticipates being required to spend considerably more time and money to try and mitigate his injuries.

59.     Plaintiff is especially alarmed by the type of stolen or accessed PII listed in Defendant's notice letter. Despite Defendant providing that list, Plaintiff cannot be sure whether more of his PII was exfiltrated.

60.     Plaintiff knows that cybercriminals often sell Private Information, and that his PII could be abused months or even years after a data breach.

61.     Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

62.    Had Plaintiff been aware that Defendant's computer systems were not secure, he would not have entrusted Defendant with his personal data.

### ***Value Of Private Information***

63.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[10] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[11]

64.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[12]

65.    For example, Personal Information can be sold at a price ranging from $40 to $200.[13] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[14]

66.    Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life.  The popular person privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which

---

[10] 17 C.F.R. § 248.201 (2013).

[11] *Id.*

[12] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/

[13] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*:    https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/

[14] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.

67.    It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers, which were compromised for some Class Members in the Data Breach, are among the worst kind of Private Information to have been stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

68.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers and names.

69.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

70.    Defendant knew or should have known of the risks and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

### ***Defendant Failed to Comply with FTC Guidelines***

71.    The Federal Trade Commission ("FTC") has promulgated many guides for businesses which show how important it is to implement reasonable data security practices. According to the FTC, the need for data security should shape

all business decision-making.

72.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[15] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor incoming traffic for activity suggesting someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[16]

73.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

74.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions also clarify the measures businesses must take to meet their data security obligations.

75.    Defendant failed to properly implement basic data security practices.

---

[15] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (2016), *available at* www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited March 7, 2025).
[16] *Id*.

76.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to current and former employees' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

77.     Defendant was always fully aware of its obligation to protect the PII of its current and former employees. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### *Defendant Fails to Comply with Industry Standards*

78.     Experts studying cybersecurity routinely identify institutions that store PII like Defendant as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

79.     Some industry best practices that should be implemented by institutions dealing with sensitive PII, like Defendant, include, but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, implementing reasonable systems to identify malicious activity, implementing reasonable governing policies, and limiting which employees can access sensitive data. As evidenced by the Data Breach and its timeline, Defendant failed to follow some or all these industry best practices.

80.     Other best cybersecurity practices that are standard at large institutions that store PII include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points.

81.     Moreover, a properly trained helpdesk that understands how to face social engineering attacks is an expected part of all cybersecurity programs.

82.     As evidenced by the Data Breach and its timeline, Defendant failed to

1   follow some or all these industry best practices.

2       83.    Defendant failed to meet the minimum standards of any of the

3   following frameworks: the NIST Cybersecurity Framework Version 2.0 (including

4   without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05,

5   PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05,

6   PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and

7   the Center for Internet Security's Critical Security Controls (CIS CSC), which are

8   all established standards in reasonable cybersecurity readiness.

9       84.    Defendant failed to comply with these accepted standards, thereby

10  opening the door to and causing the Data Breach.

11  **The Data Breach Caused Plaintiff and the Class Members Injury and**

12  **Damages**

13      85.    Plaintiff and members of the proposed Class have suffered injury and

14  damages from the unauthorized disclosure and misuse of their Private Information

15  disclosed in the Data Breach that can be directly traced to Defendant, that has

16  occurred, is ongoing, and/or will imminently occur.

17      86.    Plaintiff and Class Members have been damaged by the compromise

18  and exfiltration of their Private Information in the Data Breach, and by the severe

19  disruption to their lives as a direct and foreseeable consequence of this Data Breach

20      87.    Data Breaches such as the one experienced by Defendant's current and

21  former employees are especially problematic because of the disruption they cause

22  to the daily lives of victims affected by the attack.

23      88.    As stated prior, on information and belief, in the Data Breach,

24  cybercriminals were able to access the Plaintiff's and the proposed Class Members'

25  Private Information, which is now being used or will imminently be used for

26  fraudulent purposes and/or has been sold for such purposes and posted on the Dark

27  Web for sale, causing widespread injury and damages.

28      89.    Once an individual's Private Information is for sale and access on the

dark web, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[17]

90.    The ramifications of Defendant's failure to keep Plaintiff's and the Class's Private Information secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, or other information, such as addresses, without permission, to commit fraud or other crimes.

91.    Because Defendant failed to prevent the Data Breach, Plaintiff and the proposed Class Members have suffered, will imminently suffer, and will continue to suffer injury-in-fact and damages, including but not limited to:

a.    The loss of privacy and the opportunity to control how Private Information is used;

b.    Unauthorized use of stolen Private Information;

c.    Dramatic increase in spam telephone calls;

d.    Emotional distress and anxiety;

e.    The compromise and continuing publication of their Private Information;

f.    Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud, and for necessary credit monitoring and identity theft protection;

g.    Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

---

[17] Ryan Toohil, *What do Hackers do with Stolen Information*, Aura, (September 5, 2023) https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited February 18, 2025).

h.      The diminution in value of their Private Information;

i.      Delay in receipt of tax refund monies; and,

j.      The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in its possession.

## The Data Breach Caused Plaintiff and the Class Members Increased Risk of Identity Theft

92.     Furthermore, the Data Breach has placed Plaintiff and the proposed Class Members at an increased risk of fraud and identity theft.

93.     Plaintiff and Class Members are at a heightened risk of identity theft for years to come, especially because Defendant's failures resulted in Plaintiff's and Class Members' PII falling into the hands of identity thieves.

94.     The unencrypted PII of Class Members has already or will end up for sale on the dark web because that is the *modus operandi* of hackers. Indeed, when these criminals do not post the data to the dark web, it is usually at least sold on private Telegram channels to even further identity thieves who purchase the PII for the express purpose of conducting financial fraud and identity theft operations.

95.     Further, the standard operating procedure for cybercriminals is to use some data, like the PII here, to access "Fullz packages" of that person to gain access to the full suite of additional PII that those cybercriminals have access through other means. Using this technique, identity thieves piece together full pictures of victim's information to perpetrate even more types of attacks.

96.     With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

97.     The development of "Fullz" packages means here that the stolen PII

from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

98.    There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in victim's names; victim's losing health care benefits (medical identity theft); hackers taking over email and other accounts; time and effort to repair credit scores; losing home due to mortgage and deed fraud; theft of tax refunds; hackers posting embarrassing posts on victim's social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victim's names; victims' personal data circulating the Dark Web forever; victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.

99.    The FTC recommends that identity theft victims take several costly steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.[18]

100.   Identity thieves use stolen PII such as Social Security numbers for a

---

[18] Federal Trade Commission, *What To Do Right Away* (2024), *available at* https://www.identitytheft.gov/Steps (last visited February 17, 2025).

variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

101. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [19] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[20]

102. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[21]

103. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[22] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for

---

[19] *See* https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases.
[20] *Id.*
[21] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf
[22] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/

jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[23]

104.   Identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's PII to police during an arrest—resulting in an arrest warrant being issued in the victim's name. That can be even more problematic and difficult to remedy for someone who already has a criminal record.

105.   Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.  Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

106.   It is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not

---

[23] *See* https://www.investopedia.com/terms/s/ssn.asp

permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

107.   Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[24]

108.   The California state government warns patients that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[25]

109.   Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls: "For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. Thirty-three percent reported not having enough money to pay for food and

---

[24] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft
[25] *See* https://oag.ca.gov/idtheft/facts/your-ssn

utilities, while 14% were evicted because they couldn't pay rent or their mortgage. Fifty-four percent reported feelings of being violated."

110.   What's more, theft of PII is also gravely serious outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become interconnected through the lens of massively complex cloud computing, PII are valuable property rights.

111.   PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

112.   Where the most PII belonging to Plaintiff and Class Members was accessible from Defendant's network, there is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and the Class Members are at an increased risk of fraud and identity theft for many years into the future.

113.   Further, there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

See GAO Report, at p. 29.

114.    Thus, Plaintiff and the Class Members must vigilantly monitor their financial and credit accounts for many years to come.

115.    Accordingly, the Data Breach has caused Plaintiff and the proposed Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein.

116.    To date, Defendant has done little to provide Plaintiff and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach. Defendant has only offered 12 months of inadequate credit monitoring services, despite Plaintiff and Class Members being at risk of identity theft and fraud for the remainder of their lifetimes.

117.    Defendant knew or should have known of these harms which would be caused by the Data Breach it permitted to occur and strengthened its data systems accordingly.

### Loss of Time to Mitigate Risk of Identity Theft and Fraud

118.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

119.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

120.    Because of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that his or her Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could

expose the individual to greater financial harm and a Defendant arguing that the individual failed to mitigate damages.

121.    The need to spend time mitigating the risk of harm is especially important in cases like this where Plaintiff's and Class Members' Social Security numbers or other government identification are affected.

122.    By spending this time, data breach Plaintiff was not manufacturing his own harm, he was taking necessary steps at Defendant's direction and because the Data Breach included their Social Security numbers.

123.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience because of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

124.    These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to his good name and credit record."[26]

125.    The 12 months of credit monitoring offered to persons whose Private Information was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud.

**Diminution in Value of Private Information**

126.    PII is a valuable property rights.[27] Its value is axiomatic, considering

---

[26] See U.S. Gov't Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[27] *See, e.g.*, Randall T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich.

the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

127.  An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[28]

128.  In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[29]

129.  Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[30]

130.  As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

**The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary**

131.  Based on the value of the information stolen, the data either has or will be sold to cybercriminals whose mission it is to perpetrate identity theft and fraud.

---

J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[28] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Oct. 18, 2024).

[29] https://datacoup.com/ (last visited May 6, 2025).

[30] Nielsen Computer & Mobile Panel, Frequently Asked Questions, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited May 6, 2025).

Even if the data is not posted online, these data are ordinarily sold and transferred through private Telegram channels wherein thousands of cybercriminals participate in a market for such data so that they can misuse it and earn money from financial fraud and identity theft of data breach victims.

132.    Such fraud may go undetected for years; consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

133.    Given the risks to Plaintiff and the Class Members, the future cost of credit and identity theft monitoring is both reasonable and necessary.

134.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more per year per Class Member. This is a reasonable and necessary cost to monitor and protect Plaintiff and the Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of seven years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

## V.    DEFENDANT'S BREACH

135.    Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and its data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.    Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.    Failing to adequately protect employees' Private Information;

c.    Failing to properly monitor its own data security systems for existing intrusions;

d.  Failing to store files containing sensitive data in an encrypted state;

e.  Failing to train employees in the proper handling of emails containing malicious software, and to and maintain adequate email security practices;

f.  Failing to put into place proper procedures, software settings, and data security software protections to adequately protect against a blunt force intrusion;

g.  Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act; and

h.  Failing to adhere to industry standards for cybersecurity.

136.  As the result of computer systems needing security upgrading, inadequate procedures for handling emails containing ransomware or other malignant computer code, and inadequately trained employees who opened files containing the ransomware virus, Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information.

137.  Plaintiff and Class Members now face an increased risk of fraud and identity theft.

## VI.    PLAINTIFF'S AND CLASS MEMBERS' DAMAGES

138.  Defendant has failed to provide Plaintiff and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach. Defendant has only offered 12 months of inadequate credit monitoring

services, despite Plaintiff and Class Members being at risk of identity theft and fraud for the remainder of their lifetimes.

139.    The 12 months of credit monitoring offered to persons whose Private Information was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud.

140.    Defendant's failure to compensate is wholly inadequate as it fails to make whole all victims of the Data Breach, who commonly face multiple years of ongoing identity theft, and it provides no compensation for its unauthorized release and disclosure of Plaintiff's and Class Members' Private Information.

141.    Defendant's credit monitoring advice to Plaintiff and Class Members places the burden on Plaintiff and Class Members, rather than on Defendant, to investigate and protect themselves from Defendant's tortious acts resulting in the Data Breach.

142.    Plaintiff and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

143.    Plaintiff's Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

144.    Plaintiff was damaged in that their Private Information is in the hands of cyber criminals.

145.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

146.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

147.    Plaintiff and Class Members face substantial risk of out-of-pocket

fraud losses such as loans opened in their names, medical services billed in their names, and similar identity theft.

148.   Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

149.   Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

150.   Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Many courts have recognized the propriety of loss of value damages in related cases.

151.   Plaintiff and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

152.   Plaintiff and Class Members have suffered or will suffer actual injury as a res of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

       a.   Finding fraudulent charges;

       b.   Canceling and reissuing credit and debit cards;

       c.   Purchasing credit monitoring and identity theft prevention;

       d.   Addressing their inability to withdraw funds linked to compromised accounts;

       e.   Taking trips to banks and waiting in line to obtain funds held in limited accounts;

       f.   Placing "freezes" and "alerts" with credit reporting agencies;

g.  Spending time on the phone with or at a financial institution to dispute fraudulent charges;

h.  Contacting financial institutions and closing or modifying financial accounts;

i.  Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

j.  Paying late fees and declined payment fees imposed because of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k.  Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

153.  Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by implementing security measures and safeguards, including, but not limited to, making sure that the storage of data or documents containing personal and financial information is inaccessible online and that access to such data is password protected.

154.  Further, because of Defendant's conduct, Plaintiff and Class Members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm

155.  As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

# VII.  CLASS ACTION ALLEGATIONS

156.  Plaintiff brings this nationwide class action on behalf of himself and on behalf of others similarly situated under Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

157.  The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> **Nationwide Class: All persons whose Private Information was compromised because of the Data Breach that occurred in February 2024 (the "Class").**

> **California Subclass: All individuals and entities residing or have resided in California whose Private Information was compromised in the Data Breach that occurred in February 2024.**

158.  Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

159.  Plaintiff reserves the right to amend or modify the class definitions with greater specificity or division after having an opportunity to conduct discovery.

160.  The proposed Class meets the criteria for certification under Rule 23 because the class of persons who suffered the same harm as Plaintiff is easily ascertainable.

161.  Numerosity. The Members of the Class are so numerous that joinder of all of them is impracticable. The exact number of Class Members is unknown to

Plaintiff now, but Defendant has reported to the Attorneys General of California, Massachusetts, and New Hampshire that residents of those states were impacted by the Data Breach, indicating a broad geographic scope and further supporting the impracticability of joinder.

162. <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendant's data security systems prior to and during the Data Breach adhered to industry standards;

e. Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f. Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

h. Whether Plaintiff and Class Members suffered legally cognizable damages from Defendant's misconduct;

i. Whether Defendant's conduct was negligent;

j. Whether Defendant's conduct was *per se* negligent;

k. Whether Defendant was unjustly enriched;

l.  Whether Defendant's acts, inactions, and practices complained of herein amount to acts of intrusion upon seclusion under the law;

m. Whether Defendant failed to provide notice of the Data Breach promptly; and

n.  Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

163.    Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Defendant. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class Members, and no defenses are unique to Plaintiff. Plaintiff's claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

164.    Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

165.    Predominance. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

166.    Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common

questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

167.    Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

168.    Likewise, issues that will arise in this case are appropriate for certification under Rule 23 because such issues are common to the Class, the resolution of which would advance the matter and the parties' interests therein. Such issues include, but are not limited to:

    a. Whether Defendant failed to timely notify the public of the Data Breach;

    b. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

    c. Whether Defendant's security measures to protect its data systems were reasonable considering best practices recommended by data security experts;

    d. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

    e. Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

f.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

169.  Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## VIII.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### NEGLIGENCE AND NEGLIGENCE *PER SE*

### (On Behalf of Plaintiff and All Class Members)

170.  Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

171.  Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

172.  Defendant's duty to use reasonable care arose from several sources, including but not limited to those described below.

173.  Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing Private Information that is routinely targeted by criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats.

174.  Defendant's duty also arose by operation of statute. The FTC Act imposes a duty on Defendant to implement and maintain reasonable security

procedures and practices to safeguard and protect against unauthorized disclosure of personal information.

175.    Defendant holds itself out as a trusted manufacturing company and thereby assumes a duty to reasonably protect its employees information. Indeed, Defendant, as a manufacturing company, was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

176.    Defendant breached the duties owed to Plaintiff and Class Members and thus was negligent. Defendant breached these duties by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of information in its possession that resulted in the unauthorized access and compromise of Private Information; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; and (f) failing to detect the breach at the time it began or within a reasonable time thereafter.

177.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their Private Information would not have been compromised.

178.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendant or failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Defendant's duty.

179.    Defendant violated Section 5 of the FTC Act by failing to use

reasonable measures to protect the Private Information and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of a data breach involving the Private Information of its consumers.

180.   Plaintiff and members of the Class are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

181.   Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

182.   The harm that has occurred as a result of Defendant's conduct is the type of harm that the FTC Act was intended to guard against.

183.   Defendant violated its own policies by actively disclosing Plaintiff's and Class Members' Private Information; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information; failing to maintain the confidentiality of Plaintiff's and the Class Members' records; and by failing to provide timely notice of the breach of Private Information to Plaintiff and the Class.

184.   As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including:

    a.   Theft of their Private Information;

    b.   Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

    c.   Costs associated with purchasing credit monitoring and identity theft protection services;

    d.   Lowered credit scores resulting from credit inquiries following fraudulent activities;

    e.   Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Defendant Data Breach

– including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.  The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their Private Information being placed in the hands of criminals;

g.  Damages to and diminution in value of their Private Information entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.  Continued risk of exposure to hackers and thieves of their Private Information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

i.  Loss of their privacy and confidentiality in their Private Information;

j.  The erosion of the essential and confidential relationship between Defendant and Plaintiff and Class Members; and

k.  Loss of personal time spent carefully reviewing statements from health insurers and providers to check for charges for services not received.

l.  As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**

**BREACH OF IMPLIED CONTRACT**

**(On Behalf of Plaintiff and All Class Members)**

185.  Plaintiff re-alleges and incorporates the above allegations as if fully

set forth herein.

186.    When Plaintiff and Class Members provided their Private Information to Defendant in exchange for employment with Defendant, they entered implied contracts with Defendant under which Defendant agreed to reasonably protect such information.

187.    Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

188.    In entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and adhered to industry standards.

189.    Plaintiff and Class Members provided labor to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

190.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

191.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

192.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

193.    Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

194.    As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged here, including the loss of

the benefit of the bargain.

195.   Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach.

196.   Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

### THIRD CAUSE OF ACTION
### INVASION OF PRIVACY
### (On Behalf of Plaintiff and All Class Members)

197.   Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

198.   Defendant wrongfully intruded upon Plaintiff's and Class Members' seclusion in violation of California law. Plaintiff and Class Members reasonably expected the Private Information they entrusted to Defendant would be kept confidential from unauthorized third parties.

199.   Defendant unlawfully invaded Plaintiff's and Class Members' privacy rights by:

    a. failing to adequately secure their personal information from disclosure to unauthorized third parties or for improper purposes;

    b.  enabling the disclosure of personal and sensitive facts about them in a manner highly offensive to a reasonable person; and

    c. enabling the disclosure of personal and sensitive facts about them without their informed, voluntary, affirmative, and clear consent.

200.   A reasonable person would find it highly offensive that Defendant, having received, collected, and stored Plaintiff's and Class Members' Private Information, failed to protect that information from unauthorized disclosure to third

parties.

201.    In failing to adequately protect Plaintiff's and Class Members' Private Information, Defendant acted knowingly and in reckless disregard of their privacy rights. Defendant also knew or should have known that its ineffective security measures, and their foreseeable consequences, are highly offensive to a reasonable person in Plaintiff's and Class Members' position.

202.    Defendant's unlawful invasions of privacy damaged Plaintiff and Class Members. As a direct and proximate result of Defendant's unlawful invasions of privacy, Plaintiff and Class Members suffered mental distress, and their reasonable expectations of privacy were frustrated and defeated.

## FOURTH CAUSE OF ACTION
## UNJUST ENRICHMENT
### (On Behalf of Plaintiff and All Class Members)

203.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

204.    Plaintiff brings this claim individually and on behalf of all Class Members. This count is pled in the alternative to the breach of contract count above.

205.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, which include funds generated from its operations and budget allocations covering employee-related systems and infrastructure.

206.    As such, a portion of Defendant's general budget—allocated for employee systems and human resources functions—should reasonably have been used to implement and maintain adequate data security measures to protect the Private Information of its current and former employees, including Plaintiff and Class Members.

207.    Plaintiff and Class Members conferred a benefit on Defendant by providing their labor and services as employees. In the course of that employment,

they were required to provide Defendant with sensitive Private Information. In exchange, Plaintiff and Class Members should have received the benefit of adequate protection for that Private Information through reasonable and industry-standard data security measures.

208.    Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

209.    Defendant enriched itself by saving the costs Defendant reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information. Rather than providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by using cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

210.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

211.    Defendant failed to secure Plaintiff's and Class Members' Private Information and thus did not provide full compensation for the benefit Plaintiff and Class Members provided.

212.    Defendant acquired the Private Information through inequitable means in that they failed to disclose the inadequate security practices alleged.

213.    If Plaintiff and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

214.    Plaintiff and Class Members have no adequate remedy at law.

215.  As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to:

  a.  actual identity theft;

  b.  the loss of the opportunity of how their Private Information is used;

  c.  the compromise, publication, and/or theft of their Private Information;

  d.  out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information;

  e.  lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft;

  f.  the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and

  g.  future costs in terms of time, effort, and money to be expended to prevent, detect, contest, and repair the effect of the Private Information compromised because of the Data Breach for the rest of the lives of Plaintiff and Class Members.

216.  As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

217.  Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to

refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

### FIFTH CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS & PROF. CODE § 17200, *ET SEQ,*

### (On Behalf of Plaintiff and All Class Members)

218.   Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

219.   Defendant is a "person" defined by Cal. *Bus. & Prof. Code*. §17201.

220.   Defendant violated Cal. *Bus. & Prof. Code*. §17200 et seq. (UCL) by engaging in unlawful, unfair and deceptive acts and practices.

221.   Defendant stored Plaintiff and Class Members' Private Information in its electronic and consumer information databases. Defendant represented to Plaintiff and Class Members that their Private Information was secure, and that Plaintiff and the Class Members' Private Information would remain private. Defendant engaged in unfair acts and business practices by representing that it had secure computer systems when it did not.

222.   Even without these misrepresentations, Plaintiff and the Class Members were entitled to, and did, assume Defendant would take appropriate measures to keep their Private Information safe. Defendant did not disclose at any time that Plaintiff and Class Members' Private Information was vulnerable to hackers because Defendant's data security measures were inadequate and outdated, and Defendant was the only entity in possession of that material information, which it had a duty to disclose.

223.   Defendant knew or should have known it did not employ reasonable measures that would have kept Plaintiff and the Class Members' Private Information secure and prevented the loss or misuse of Plaintiff and the Class Members' Private Information.

224. Defendant violated the UCL by misrepresenting, both by affirmative conduct and by omission, the security of its systems and services, and its ability to safely store Plaintiff and the Class Members' Private Information. Defendant also violated the UCL by failing to implement and maintain reasonable security procedures and practices appropriate to protect Private Information, and by failing to immediately notify Plaintiff and the Class Members of the Data Breach.

225. Defendant also violated its commitment to maintain the confidentiality and security of Plaintiff's and the Class Members' Private Information and failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security.

226. **Defendant engaged in unfair business practices under the "balancing test."** The harm caused by Defendant's actions and omissions, as described in detail above, greatly outweigh any perceived utility. Indeed, Defendant's failure to follow basic data security protocols and misrepresentations to Plaintiff and Class Members about Defendant's data security cannot be said to have had any utility at all. All these actions and omissions were clearly injurious to Plaintiff and the Class Members, directly causing the harms alleged below.

227. **Defendant engaged in unfair business practices under the "tethering test."** Defendant's actions and omissions, as described in detail above, violated fundamental public policies expressed by the California Legislature. *See, e.g.,* Cal. *Civ. Code* § 1798.1 ("The Legislature declares that ... all individuals have a right of privacy in information pertaining to them.... The increasing use of computers ... has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. *Civ. Code* § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. *Bus. & Prof. Code* § 22578 ("It is the intent of the Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern.") Defendant's acts and omissions,

1  and the injuries caused by them, are thus "comparable to or the same as a violation

2  of the law …" *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone*

3  *Co.* (1999) 20 Cal. 4th 163, 187.

4      228.  **Defendant engaged in unfair business practices under the "FTC**

5  **test."** The harm caused by Defendant's actions and omissions, as described in detail

6  above, is substantial in that it affects tens of thousands of Class Members and has

7  caused those persons to suffer actual harms. Such harms include a substantial risk

8  of identity theft, disclosure of Plaintiff's and the Class Members' Private

9  Information to third parties without their consent, diminution in value of their

10  Customer Data, consequential out of pocket losses for procuring credit freeze or

11  protection services, identity theft monitoring, and other expenses relating to identity

12  theft losses or protective measures. This harm continues given the fact that

13  Plaintiffs' and the Class Members' Private Information remains in Defendant's

14  possession, without adequate protection, and is also in the hands of those who

15  obtained it without their consent. Defendant's actions and omissions violated, *inter*

16  *alia*, Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45. *See, e.g.,*

17  *F.T.C. v. Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602, 613 (D.N.J. 2014), *aff'd*,

18  799 F.3d 236 (3d Cir. 2015); *In re LabMD, Inc.*, FTC Docket No. 9357, FTC File

19  No. 102-3099 (July 28, 2016) (failure to employ reasonable and appropriate

20  measures to secure personal information collected violated § 5(a) of FTC Act); *In*

21  *re BJ's Wholesale Club, Inc.*, -4148, FTC File No. 042-3160 (Sept. 20, 2005)

22  (same); *In re CardSystems Solutions, Inc.*, FTC Docket No. C-4168, FTC File No.

23  052-3148 (Sept. 5, 2006) (same); *see also United States v. ChoicePoint, Inc.*, Civil

24  Action No. 1:06-cv-0198-JTC (N.D. Ga. Oct. 14, 2009) ("failure to establish and

25  implement, and thereafter maintain, a comprehensive information security program

26  that is reasonably designed to protect the security. confidentiality, and integrity of

27  personal information collected from or about consumers" violates § 5(a) of FTC

28  Act); 15 U.S.C. § 45(n) (defining "unfair acts or practices" as those that "cause[ ]

or[are] likely to cause substantial injury to consumers which [are] not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.").

229.   Plaintiff and the Class Members suffered injury in fact and lost money or property as the result of Defendant's unfair business practices. In particular, Plaintiff and the Class Members have suffered from improper or fraudulent charges to their credit/debit card accounts; and other similar harm, all as a result of the Data Breach. In addition, their Private Information was taken and is in the hands of those who will use it for their own advantage, or is being sold for value, making it clear that the hacked information is of tangible value. Plaintiff and the Class Members have also suffered consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures.

230.   Defendant's 'unfair' acts and practices further include:

a.   Utilizing cheaper, ineffective security measures and diverting those funds to its own profit, instead of providing a reasonable level of security that would have preventing the hacking incident;

b.   Failing to follow industry standard and the applicable, required and appropriate protocols, policies and/or procedures regarding the encryption of data;

c.   Failing to timely and adequately notify Class Members about the Data Breach and the scope of same, so that Class Members could take appropriate steps to mitigate the potential for identity theft and other damages;

d.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class Members' PII; and

e.   Omitting, suppressing and concealing the material fact that Defendant

did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII.

231. Defendant has engaged in 'unlawful' business practices by violating multiple laws, including the FTC Act, 15 U.S.C. §45, Gramm-Leach-Biley Act ("GLBA"), Cal. *Civ. Code* § 1798.82, and California common law.

232. Defendant's unlawful acts and practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect it's employees PII, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' personal information, including duties imposed by the FTC Act 15 U.S.C. §45 and GLBA, which was a direct and proximate cause of the Data Breach;

d. Failing to comply with Cal. *Civ. Code* § 1798.82;

e. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Class Members' personal information, including by implementing and maintaining reasonable security measures; and

f. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' personal information, including duties imposed by the FTC Act, Cal. *Civ. Code* § 1798.82; 15 U.S.C. §45 and GLBA.

233. Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' personal

information.

234.   As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Plaintiff and Class Members' were injured and lost money or property, which would not have occurred but for the unfair and deceptive acts, practices, and omissions alleged herein, time and expenses related to monitoring financial accounts for fraudulent activity, an increased, imminent risk of fraud and identity theft, and loss of value of their personal information.

235.   Defendant's violations were, and are, willful, deceptive, unfair and unconscionable.

236.   Defendant's poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendant and/or its agents for financial services, Plaintiff and other reasonable consumers understood and expected that they were, in part, paying for the product and/or service and necessary data security to protect the Private Information, when in fact Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

237.   Plaintiff and Class Members have lost money and property as a result of Defendant's conduct in violation of the UCL, as stated herein and above.

238.   By deceptively storing, collecting, and disclosing their personal information, Defendant has taken money or property from Plaintiff and Class Members.

239.   Defendant acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiff's and Class Members' rights.

240.   Plaintiff and Class Members seek all monetary and nonmonetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices or use of their personal

information; declaratory relief; reasonable attorneys' fees and costs under Cal. *Code of Civ. Proc.* § 1021.5; injunctive relief; and other appropriate equitable relief, including public injunctive relief.

## IX.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class described above seeks the following relief:

a.    For an Order certifying this action as a class action, defining the Class as requested herein, appointing Plaintiff and his counsel to represent the Class, and finding that Plaintiff is proper representatives of the Class requested herein;

b.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein relating to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c.    For equitable relief compelling Defendant to use appropriate methods and policies related to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d.    For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained because of Defendant's wrongful conduct;

e.    Ordering Defendant to pay for not less than ten years of credit monitoring services for Plaintiff and the Class;

f.    For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g.    For an award of punitive damages, as allowable by law;

h.    For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i.    Pre- and post-judgment interest on any amounts awarded; and

j.      Any other relief that this court may deem just and proper.

Dated: May 7, 2025

**KRISTENSEN LAW GROUP & EKSM, LLP**

_/s/ John P. Kristensen_

John P. Kristensen
Leigh S. Montgomery*
Pro Hac Forthcoming

***Attorneys for Plaintiff and the Putative Class***

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury for all such triable claims.

Dated: May 7, 2025

**KRISTENSEN LAW GROUP &
EKSM, LLP**

*/s/ John P. Kristensen*

John P. Kristensen
Jarrett L. Ellzey*
Pro Hac Forthcoming

***Attorneys for Plaintiff and the
Putative Class***

7:51

Photo ⌄                              Done

# EXHIBIT A



**Silgan Containers**
Secure Processing Center
25 Route 111, P.O. Box 1048
Smithtown, NY 11787

Billy Joel Villareal

April 25, 2025

Dear Billy Joel Villareal:

Silgan Containers ("Silgan") writes to inform you of a recent event which may impact some of your information. While we are not aware of any actual or attempted misuse of your information, we are providing information regarding the event, our response, and resources to help further protect your information, should you feel it necessary to do so.

**What Happened?** On February 15, 2024, Silgan became aware of suspicious activity related to certain computer systems. We promptly took steps to secure our environment and launched an investigation to determine the nature and scope of the activity. The investigation determined there was unauthorized access to certain files and folders within Silgan systems and some information was copied from these systems between February 2, 2024 and February 16, 2024.

**What Information Was Involved?** Silgan undertook a comprehensive review in order to determine whether the involved files contain any sensitive information and to enrich the data to identify impacted individuals. This review was completed on or about December 6, 2024 and determined that information present on the systems included your name and Social Security number and date of birth. To date, Silgan is unaware of any actual or attempted identity theft or fraud as a result of this event and is providing you with this notice out of an abundance of caution.

**What We Are Doing.** Silgan takes this event and the security of information in our care very seriously. Upon learning of the event, we moved quickly to respond and investigate the event, assess the security of our network, and determine whether any sensitive information was impacted. As part of our ongoing commitment to information security, we have taken various technical and organizational measures to enhance the security of our systems and help prevent similar incidents in the future. Silgan also notified law enforcement and will be notifying relevant regulators, as required.

Silgan is also offering you 12 months of complimentary credit monitoring through Experian. You must enroll in these services as Silgan cannot do so on your behalf. Enrollment instructions can be found in the enclosed information.

**What You Can Do.** We encourage you to remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors. Please review the enclosed information, which includes further information on what you can do to protect your information against misuse, should you feel it necessary to do so. Additionally, Silgan encourages you to enroll in the complimentary credit monitoring being offered.

